UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| SUSAN SCHAEFER-LAROSE, on behalf of herself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 1:07-cv-1133-SEB-TAB |
| ELI LILLY AND COMPANY, | ) ) | |
| Defendant. | ) | |

## ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF SUSAN SCHAEFER-LAROSE

This cause is before the Court on the Motion for Summary Judgment as to Plaintiff, Susan Schaefer-LaRose [Docket No. 68], filed by Defendant, Eli Lilly and Company ("Lilly"), on December 17, 2007, pursuant to Federal Rule of Civil Procedure 56.  Plaintiff, Susan Schaefer-LaRose, brings her claim against Lilly, her former employer, alleging that Lilly failed to provide her with overtime compensation, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and New York wage law.  Lilly rejoins that Ms. Schaefer-LaRose was exempt from the overtime pay provisions under both the FLSA and New York law.

On July 7, 2008, four days before the due date for her response to Lilly's summary judgment motion, Ms. Schaefer-LaRose filed a Rule 56(f) motion [Docket No. 464], requesting that the Court grant her a 30-day extension of the due date because Lilly had allegedly failed to produce discovery essential to her response.  However, on July 21,

2008, before the Court had ruled on her Rule 56(f) motion, Ms. Schaefer-LaRose filed her response in opposition to Lilly's motion for summary judgment without mention of the pending Rule 56(f) motion.  On August 8, 2008, the Magistrate Judge denied as moot Ms. Schaefer-LaRose's Rule 56(f) motion [Docket No. 554] on the ground that she had filed a timely response to Lilly's summary judgment motion.  On August 28, 2008, Ms. Schaefer-LaRose filed objections to the Magistrate Judge's August 8, 2008, order denying her Rule 56(f) motion [Docket No. 559], contending that her filing of her substantive response to Lilly's motion for summary judgment did not moot the need for Rule 56(f) relief.  For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment[1] and <u>DENY</u> Plaintiff's Rule 56(f) motion.[2]

## **Factual Background**

Lilly is a global, research-based pharmaceutical company headquartered in Indianapolis, Indiana, that develops and manufactures pharmaceutical products.  As part

---

[1] Because, for the reasons detailed below, we find that Ms. Schaefer-LaRose was exempt from the FLSA's overtime requirements under both the outside sales and administrative exemptions, we need not address Lilly's arguments that parts of her claims are also barred under the highly compensated and motor carrier exemptions.

[2] On September 30, 2008, Ms. Schaefer-LaRose filed a Motion for Leave to File Notice of Supplemental Authority [Docket No. 567] and on January 27, 2009, filed a Motion for Leave to File a Response to Defendant's Supplemental Authority [Docket No. 620].  On November 18, 2008, Lilly filed a Motion for Leave to File Department of Labor Amicus Brief as Notice of Supplemental Authority [Docket No. 589] and on April 3, 2009, filed a Motion for Leave to File Notice of Supplemental Authorities [Docket No. 629].  We hereby <u>GRANT</u> these motions and said documents shall be deemed filed as of the date of this Order.

of its business, Lilly employs individuals as "sales representatives," who are responsible for visiting physicians, informing them about Lilly pharmaceutical products and encouraging them to prescribe Lilly's products to their patients, when and as appropriate. In May 1998, Lilly hired Ms. Schaefer-LaRose as a Sales Representative, which was the position she held until 2000, when she became a "Senior Sales Representative." Deposition of Susan Schaefer-LaRose ("Schaefer-LaRose Dep.) at 39.  Lilly contends that this change constituted a promotion, but Ms. Schaefer-LaRose maintains that it was simply a change in job title, not a formal promotion.  Id. at 41.  However, Ms. Schaefer-LaRose testified in her deposition that her title changed in part because, by that point, she was better at dealing with physicians than the more junior representatives, having gained "accumulated knowledge from being with the company longer."  Id. at 43.  Ms. Schaefer-LaRose remained a Senior Sales Representative until her tenure at Lilly ended in 2006.

**Plaintiff's Sales Training and Duties**

During her employment with Lilly, Ms. Schaefer-LaRose was responsible for calling on physicians throughout various territories in the State of New York, including areas around Syracuse, Binghamton, and Utica.  Schaefer-LaRose Dep. at 47.  Ms. Schaefer-LaRose received her initial training at a facility located in Indianapolis, where she was taught, among other skills, how to "detail" Lilly's products to physicians to enable them to make educated decisions about which products would be best for their patients.  Id. at 122-24.  Lilly also trained Ms. Schaefer-LaRose in the "sales productivity

3

processes," which included four components (tiering, frequency, message, and program) that, according to Ms. Schaefer-LaRose, were all controlled by Lilly's policies and procedures.  Id. at 143-45.  As part of that training, Ms. Schaefer-LaRose was instructed to "ask for business on every call" and to "ask the physician to commit to prescribe" Lilly products in their practices when medically appropriate; however, Lilly sales representatives never actually sold Lilly products to physicians or other buyers.  Id. at 177.  As a sales representative,[3] Ms. Schaefer-LaRose was required to become familiar with the pharmaceutical products of Lilly's competitors in order to understand the competitive market.  Id. at 251.  Her knowledge of such products was acquired through training and materials provided by Lilly.  Id. at 250.

Ms. Schaefer-LaRose's calls on physicians occurred in their offices and on each visit she would try to get a "chip," which she describes as a "piece of information about what the physician said in a positive way about [Lilly's] product" and use that information "to get a commitment" from the physician to prescribe Lilly's pharmaceuticals.  Id. at 182-83.  With input from her district manager, Ms. Schaefer-LaRose would adjust her promotional efforts based on the prescribing habits of each doctor she visited.  According to Lilly, Ms. Schaefer-LaRose had significant discretion to determine independently how frequently to visit various doctors based, in part, on the volume of prescriptions each physician wrote and was free to target her presentations

---

[3] Because the duties of a sales representative and senior sales representative appear to be the same, we refer to Ms. Schaefer-LaRose as a "sales representative" throughout this entry.

based upon data she received on a weekly basis that showed which products each doctor was prescribing (including competitors' products).  Ms. Schaefer-LaRose disputes Lilly's characterization of the level of discretion she was afforded and contends that Lilly produced "tiering" lists containing the names of specific physicians whom she was directed to visit.  Id. at 66.  Further, she asserts that she did not have the discretion to determine the frequency of visits to particular doctors or to target competitors' products. Instead, Ms. Schaefer-LaRose maintains that Lilly instructed her on the frequency of her calls on any given physician, that her district manager had to approve her routing schedules, and that she had no role in determining which physicians or which products to target since company policy dictated those decisions.  Id. at 94-96.

Ms. Schaefer-LaRose reportedly worked approximately ninety hours per week at Lilly, id. at 54, (including weekends, holidays, and vacation days, id. at 262-63), which often meant "[t]he end of the business day was midnight."  Id. at 150.  Although she concedes that no one from Lilly ever told her how many hours she should work in any given week, Ms. Schaefer-LaRose asserts that "the demands that were made [by Lilly] required the hours that were spent [working]."  Id. at 54.  Throughout her tenure at Lilly, Ms. Schaefer-LaRose spent most workdays calling on physicians, attempting to perform in line with Lilly expectations that she contact nine doctors per day.  Periodically, Ms. Schaefer-LaRose's district managers conducted "ride-alongs" to observe or participate in sales calls on the basis of which Ms. Schaefer-LaRose's performance would later be evaluated and she would be advised as to future improvements.  The frequency of the

5

ride-alongs was dependant upon the individual managers, but they occurred generally from once every two weeks to once every quarter.  Id. at 163.  In addition to the ride-alongs, Ms. Schaefer-LaRose participated in conference calls with her district manager approximately once a week or once every two weeks, during which meetings topics such as "a change in strategy for the message" or "a change in labeling" were discussed.  Id. at 60.

Lilly required its sales representatives, including Ms. Schaefer-LaRose, to be familiar with the prescription-writing habits of the physicians they contact.  Thus, part of Ms. Schaefer-LaRose's duties included analysis of reports containing the number of prescriptions written by physicians in her sales territory for each Lilly product as well as the products manufactured by major competitors, and preparation of a summary of her findings for her district manager.  Lilly used these summaries to determine whether its sales representatives were being effective in the field.  According to Ms. Schaefer-LaRose, she "lived and died by" the information in the reports and, depending on what the reports revealed, she was doing either well or doing poorly, causing her either to "keep doing what [she was] doing" or "try to up [her] frequency" and "target specific competitors, depending on their success against [Lilly's] product."  Id. at 152.  Ms. Schaefer-LaRose contends that any changes in her approach required permission from her district manager and that at all times she was subject to Lilly's strict policies and procedures governing the targeting of and frequency of calls on physicians.

Lilly required that Ms. Schaefer-LaRose receive training on and become familiar

with various disease states, such as osteoporosis, depression, bipolar disorder, and attention deficit hyperactivity disorder, in order to more effectively promote Lilly's products which were designed to treat those problems. Schaefer-LaRose Dep. at 133. Lilly's training process involved online computer testing, learning modules, educational materials, information regarding Lilly's Good Promotional Practices, memorizing scripted messages, and "verbatims for answering questions with regard to side effects, and warnings, and contraindications." Id. at 137. Ms. Schaefer-LaRose stated that she viewed the role of sales representative as similar to a "scientist" because her job was to "convey scientific information to physicians about how and why . . . [Lilly's] product is beneficial to patients." Id. at 185. Thus, she felt she was engaged not in sales, but merely in "professional visitation" due to the fact that "[t]here is no selling interaction going on." Id.

Lilly expected its sales representatives to build relationships with the physicians as well as with other staff members in the offices. Ms. Schaefer-LaRose testified that the sales representatives were "the primary contact between those physicians and Lilly." Schaefer-LaRose Dep. at 248-49. Although she was encouraged to tailor her message to each physician, based on information she had gained by asking the doctors open-ended questions about their practices and the types of patients they serviced, Ms. Schaefer-LaRose contends that, when promoting its products, she was limited to using pre-

approved scripted messages written by Lilly.  If she had time allowed during a call,[4] she would focus the message on particular factors, depending on the product she was promoting, the physician's availability and mood, and how much time she actually had to make her pitch.  Id. at 131-132.

**Plaintiff's Clerical Duties**

Lilly contends that, beyond her responsibilities relating to visiting physicians, Ms. Schaefer-LaRose also was expected to perform various clerical duties for which she exercised significant discretion, including managing a budget for meal programs with physicians, allocating resources for office supplies, selecting speakers and physicians to attend peer-to-peer programs, determining the number of pharmaceutical samples to distribute between and among doctors, and identifying "thought leaders," or physicians who were well-respected among their peers.  While conceding that she had some discretion in these areas, Ms. Schaefer-LaRose maintains that she was afforded much less discretion and independent judgment than Lilly represents.

She claims that Lilly encouraged her to use her budget for meal programs for those physicians who had been identified as the highest prescribing doctors; Lilly also discouraged her from using resources for office supplies.  Id. at 64-65.  Although Ms.

---

[4] Ms. Schaefer-LaRose testified that calls on physicians could last from thirty seconds to up to an hour (Schaefer-LaRose Dep. at 129), but, according to Lilly, "research shows that a sales representative will have approximately two minutes with a physician."  Pl.'s Exh. 6 at 798.

Schaefer-LaRose did have some choice of speakers for various programs, she was restricted to selecting individuals from the Lilly lecture bureau because those were the only approved speakers.  Declaration of Susan Schaefer-LaRose ("Schaefer-LaRose Decl.") ¶ 23.  With regard to distribution of drug samples, Ms. Schaefer-LaRose claims that she had no discretion in determining how many samples to order because her district manager always instructed that she order the maximum quantity of samples allotted each month by Lilly.  Id. ¶¶ 24-25.  In addition, Ms. Schaefer-LaRose states that Lilly expected her to divide the samples in the same manner each month, with the doctors who prescribed the most products receiving the most samples.  Finally, Ms. Schaefer-LaRose maintains that Lilly trained her on how to identify "thought leaders," the primary criteria for which was simply that the doctor be a significant prescriber of Lilly products, and her identification of these physicians required Lilly's final approval and, in any event, that she performed this function only twice between 2000 and 2006.  Id. ¶ 15.

**Plaintiff's Performance Reviews and Salary**

Ms. Schaefer-LaRose received periodic performance reviews from her supervisors, which included a report on the sales results from her territory.  In 2001, for example, Ms. Schaefer-LaRose's sales territory ranked near the bottom, and her performance review noted that she had failed to meet expectations on a certain product.  Schaefer-LaRose Dep. at 207-211; Exh. 9 (2001 Performance Review).  Another section of the performance reviews included sales-related objectives and evaluations; in one review she

was reminded that she needed to be "top 15% overall to make executive sales rep" and advised to "consistently grow TRx [total prescriptions] on a quarterly basis to insure SOM [share of market] growth."  Exh. 9 at 3; <u>see</u> <u>also</u> Schaefer-LaRose Dep. at 207, 216-217, 221-22, 224-25; Exh. 10 (2002 Performance Review).  However, Ms. Schaefer-LaRose never directly sold any Lilly product to any physician or any other buyer, nor did she accept purchase contracts or orders for Lilly products.

In addition to her fixed salary, Ms. Schaefer-LaRose was entitled to receive incentive bonus compensation based, in part, on the sales of Lilly's products as reflected by physicians' prescriptions.  The parties agree that Ms. Schaefer-LaRose's average weekly earnings throughout her final six years as a Lilly employee (2000 through 2006) exceeded $1,600.00.[5]  In 2005, Ms. Schaefer-LaRose's total compensation from Lilly amounted to $103,392.14 and, for her work during the first five months of 2006, she received $44,768.14 in total compensation.  Declaration of Alison Franke ("Franke Decl.") ¶ 4; attached Exhs. H, I.

## <u>Legal Analysis</u>

### I.   Standard of Review

Summary judgment is appropriate when the record shows that there is "no

---

[5] According to Ms. Schaefer-LaRose, her weekly earnings from 2000 to 2006 were as follows: 2000 – $1,695.00; 2001 – $1,865.55; 2002 – $1,771.14; 2002 – $1,771.14; 2003 – $1,721.50; 2004 – $1,733.15; 2005 – $1,907.90; 2006 – $2,238.41.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.  A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v.

Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

If the opposing party cannot set forth facts sufficient to survive a motion for summary judgment, Rule 56(f) of the Federal Rules of Civil Procedure[6] gives the

---

[6] Rule 56(f) provides that:

If a party opposing the [summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    (1)      deny the motion;

    (2)      order a continuance to enable affidavits to be obtained, depositions to be taken, or  other discovery to be undertaken; or

(continued...)

opposing party opportunity to submit an affidavit explaining the reason.  The court may

then: "(1) deny the motion; (2) order a continuance to enable affidavits to be obtained,

depositions to be taken, or other discovery to be undertaken; or (3) issue any other just

order."  Fed. R. Civ. Pro. 56(f).  However, the party invoking the protection of Rule 56(f)

"must do so in good faith by affirmatively demonstrating why he cannot respond to a

movant's affidavits . . . and how postponement of a ruling on the motion will enable him,

by discovery or other means, to rebut the movant's showing of the absence of a genuine

issue of material fact."  Daley v. Grajec, 2007 WL 2286132, at *5 (S.D. Ind. 2007)

(Tinder, J.) (quoting Korf v. Ball State Univ., 726 F.2d 1222, 1230 (7th Cir. 1984)).

Thus, if a plaintiff fails to show how the additional discovery he or she seeks will help

demonstrate the existence of a genuine issue of material fact, denial of a Rule 56(f)

motion is appropriate.

We first address Lilly's summary judgment motion, because, if Ms. Schaefer-

LaRose is able to set forth sufficient facts to survive summary judgment despite being

denied additional time to conduct what she contends was discovery essential to filing her

response, then we need not address her Rule 56(f) motion.  However, if Ms. Schaefer-

LaRose is unable to demonstrate the existence of a genuine issue of material fact, and/or

an error in Lilly's legal analysis that would foreclose a dismissal of her lawsuit, we shall

---

[6](...continued)
> (3)     issue any other just order.

Fed. R. Civ. Pro. 56(f).

address her objections to the Magistrate Judge's August 8, 2008, denial of her Rule 56(f)

motion.

## II.      FLSA Exemptions

The FLSA imposes various wage and hour requirements on certain employers,

including the overtime pay requirement at issue here.  See 29 U.S.C. § 207(a)(1) ("[N]o

employer shall employ any of his employees . . . for a workweek longer than forty hours

unless such employee receives compensation for his employment in excess of the hours

above specified at a rate not less than one and one-half times the regular rate at which he

is employed.").  However, in Section 13(a)(1), the Act establishes a number of so-called

"white collar" exemptions to the overtime requirement, including the outside sales,

administrative, and highly compensated exemptions.[7]

Due to the remedial nature of the overtime pay requirements, "exemptions from

---

[7] According to the Department of Labor ("DOL"), the rational behind these exemptions is
as follows:

> The legislative history [of the FLSA] indicates that the section 13(a)(1)
> exemptions were premised on the belief that the workers exempted typically
> earned salaries well above the minimum wage, and they were presumed to enjoy
> other compensatory privileges such as above average fringe benefits and better
> opportunities for advancement, setting them apart from the nonexempt workers
> entitled to overtime pay.  Further, the type of work they performed was difficult
> to standardize to any time frame and could not be easily spread to other workers
> after 40 hours in a week, making compliance with the overtime provisions
> difficult and generally precluding the potential job expansion intended by the
> FLSA's time-and-a-half overtime premium.

69 Fed. Reg. 22122, 22123-24 (Apr. 23, 2004).

14

[the FLSA's] coverage are to be narrowly construed against employers." Klein v. Rush-Presbyterian-St. Luke's Med. Center, 990 F.2d 279, 282 (7th Cir. 1993) (citations omitted).  Further, "it is the employer's burden to establish that an employee is exempt from the FLSA's overtime requirements." Kennedy v. Commonwealth Edison Co., 410 F.3d 365, 370 (7th Cir. 2005) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974)).

## A.    Outside Sales Exemption

Lilly first claims that Ms. Schaefer-LaRose's entire FLSA claim fails because she is exempt from the benefits extended under the statute as an outside sales person.  The FLSA exempts from overtime an employee who is employed "in the capacity of outside salesman." 29 U.S.C. § 213(a)(1).  DOL regulations define "outside salesman" as an employee:

> (1) Whose primary duty is:
>
>> (i) making sales within the meaning of section 3(k) of the Act, or
>>
>> (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such a primary duty.

29 C.F.R. § 541.500(a).  The parties do not dispute that Ms. Schaefer-LaRose's position meets the second requirement of the outside sales exception, to wit, that she is

customarily and regularly away from her place of business while performing her job. Their dispute centers only on whether Ms. Schaefer-LaRose's "primary duty" as a sales representative at Lilly was "making sales."[8]

Lilly contends that, because physicians decide which pharmaceuticals will be purchased by consumers based on the prescriptions they write, and Ms. Schaefer-LaRose's job was to persuade doctors within her territory to choose Lilly medicines to prescribe when and as appropriate, for which she received credit when they did prescribe Lilly medicines, she qualifies as an outside salesperson under the FLSA. Ms. Schaefer-LaRose rejoins that the outside sales exemption covers only those employees who, themselves, actually consummate sales and does not cover those employees, like herself, who merely engage in work to promote sales made by a third party. Thus, according to Ms. Schaefer-LaRose, Lilly has not met its burden to demonstrate that she comes within the outside sales exemption because it has presented no evidence that she ever personally consummated any sales transaction(s) for Lilly products.

As Lilly notes, the pharmaceutical industry is in a unique position with regard to the FLSA's outside sales exemption, since the only individuals who can legally authorize a purchase of the medications and who thus drive demand for those drugs – the physicians – do not buy them directly from the manufacturer. Consequently, a pharmaceutical sales representative, such as Ms. Schaefer-LaRose, whose efforts are

---

[8] The parties dispute does not include whether Ms. Schaefer-LaRose obtained orders or contracts for services or facilities; thus, we do not address this part of the inquiry.

targeted at encouraging physicians to prescribe the drugs, but do not result in direct sales of the medications, is in a special category with regard to "making sales," as that term is defined under the exemption.

Clearly, the unique characteristics of the pharmaceutical industry make this issue a closer question of statutory interpretation than it might otherwise be. While our research indicates that no appellate court has yet determined whether pharmaceutical sales representatives "make sales" pursuant to the FLSA's outside salesperson exemption, several district courts in sister jurisdictions to ours have addressed the issue but have arrived at conflicting results.[9] Compare Smith v. Johnson and Johnson, 2008 WL 5427802 (D.N.J. Dec. 30, 2008) (observing that, although physicians "do indeed present a chokepoint in the sales of pharmaceuticals, . . . the nature of the prescription system insulates them from being amenable to 'sales' within the definition of the applicable

---

[9] Lilly relies in part on two cases arising under California law in which the Central District of California held that pharmaceutical representatives, such as Ms. Schaefer-LaRose, are exempt as outside salespersons. See Barnick v. Wyeth, 522 F. Supp. 2d 1257 (C.D. Cal. 2007) (holding that pharmaceutical representative was exempt outside salesperson under California's analogous wage statute); D'Este v. Bayer Corp., No. 07-3206 (C.D. Cal. Oct. 9, 2007) (finding the plaintiff's exempt classification "consistent with the spirit and purpose of the [outside sales] exemption"). These cases are not particularly instructive to our analysis, however, because, as Ms. Schaefer-LaRose argues, they are limited to the issue of whether a pharmaceutical sales representative's job involves "making sales," as defined under California's analogous outside sales exemption, not under the FLSA regulations. See 522 F. Supp. 2d at 1264 (recognizing that, unlike the California outside sales exemption, requesting a commitment from a physician was likely necessary to be exempt under the FLSA sales exemption); see also Amendola v. Bristol-Meyers Squibb Co., 558 F. Supp. 2d 459 (S.D.N.Y. 2008) (declining to rely on the line of California cases because, in addition to relying on California labor law and not the FLSA, "they do not acknowledge that the FLSA's exemptions must be narrowly construed against employers, or address the governing principles of statutory construction in grappling with the plain meaning of the regulatory term 'sales'").

regulation"), and Ruggeri v. Boehringer Ingelheim Pharm., Inc., 585 F. Supp. 2d 254 (D. Conn. 2008) ["Ruggeri I"] (holding that plaintiffs, pharmaceutical sales representatives, did not fall within the outside sales exemption because they never consummated actual sales), with In re Novartis Wage and Hour Litigation, 593 F. Supp. 2d 637 (S.D.N.Y. 2009) (finding plaintiff pharmaceutical sales representatives exempt under the FLSA's outside sales exemption "produces results that reflect the exemption's terms and spirit"), and Delgado v. Ortho-McNeil, Inc., 2009 WL 2781525 (C.D. Cal. Feb. 6, 2009) (holding that pharmaceutical sales representative fall within the outside sales exemption because "physicians' prescriptions are precisely the 'other disposition' envisioned" in the FLSA's definition of "sale"). Based on our careful review of Ms. Schaefer-LaRose's duties as a Lilly sales representative in light of the FLSA regulations and the relevant caselaw, we hold that, as a pharmaceutical sales representative, Ms. Schaefer-LaRose comes within the FLSA's outside sales exemption.

We begin by noting that the regulations define "sales" as follows: "Sales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Section 3(k) of the Act states that 'sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, *or other disposition*." 29 C.F.R. § 541.501(b) (emphasis added). Promotional activity in support of sales is also addressed in the outside sales exemption regulations, providing that "[p]romotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or

solicitations is exempt work," but "promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work."  § 541.503(a).  The regulations make clear that, in determining whether an individual's promotional work is exempt, it is important whether the work involves obtaining a commitment from the customer to purchase the product.  § 541.503(c) (providing an example of non-exempt promotional work in which the employee "does not consummate the sale nor direct[s] efforts toward the consummation of a sale").

Here, Ms. Schaefer-LaRose never sold any product directly to the physicians or otherwise took orders for Lilly medications from the doctors she visited; the parties are in full agreement on this fact.  Further, any commitments to prescribe Lilly medications that Ms. Schaefer-LaRose received from the physicians on whom she made sales calls were not binding either on the physicians or the physicians' patients.[10]  However, the sole purpose of Ms. Schaefer-LaRose's regular calls on individual physicians was to persuade them to prescribe Lilly's medications as opposed to some other companies' pharmaceuticals, when and as otherwise appropriate.  She testified in her deposition that Lilly trained her to "ask for the business" from the physicians upon whom she called, which entailed at the end of her visits "asking the physician to try the product with a patient."  As described above, on each visit, Ms. Schaefer-LaRose would attempt to

---

[10] It is undisputed that regulatory and ethical restrictions on the pharmaceutical industry prevent physicians from making binding commitments to pharmaceutical sales representatives to prescribe certain drugs.

obtain a "chip," which she describes as a "piece of information about what the physician said in a positive way about [Lilly's] product" in order to use that information "to get a commitment" from the physician to prescribe Lilly's pharmaceuticals.  Schaefer-LaRose Dep. at 182-83.  According to Ms. Schaefer-LaRose, this was her "standard practice."  Id. at 177, 182-83.  Additionally, as a sales representative, Ms. Schaefer-LaRose received credit when her work was successful, reflected by the fact that her total compensation depended, in part, on the number of prescriptions for Lilly drugs issued and filled within her sales territory.

In our view, this activity constitutes "making sales," as defined under the FLSA regulations.  When Ms. Schaefer-LaRose sought and received commitments, albeit non-binding commitments, from physicians to prescribe Lilly drugs, she was acting as a sales agent for Lilly.  While her efforts did not result in consummation of sales in the traditional sense, the statutory language does not appear to require such a final sale.  See Delgado, 2009 WL 2781525 at *3 (holding that "physicians' prescriptions are precisely the 'other disposition' envisioned in the FLSA").  Courts have recognized that "[t]he touchstone for making a sale, under the Federal Regulations, is obtaining a commitment." Clements v. Serco, Inc., 530 F.3d 1224, 1227 (10th Cir. 2008).  The operative facts of the case at bar demonstrate that Lilly's sales representatives, including Ms. Schaefer-LaRose, were trained specifically to obtain such commitments from the physicians they visited, with the understanding that that is as far as they could go legally in their efforts to sell Lilly's products.

Only the nature of the heavily regulated pharmaceutical industry prevented Ms.
Schaefer-LaRose from going beyond receiving non-binding commitments from the
physicians on whom she made calls in her sales territory to consummating final sales to
them.  In Novartis, in support of its holding that pharmaceutical sales representatives
(with similar duties as Ms. Schaefer-LaRose) engaged in "making sales" under the FLSA,
the Southern District of New York observed that courts have properly "taken into account
the characteristics of the industry in question when determining the applicability of the
outside sales exemption."  593 F. Supp. 2d at 649 (citing Nielsen v. DeVry, Inc., 302 F.
Supp. 2d 747 (W.D. Mich. 2003); Gregory v. First Title of America, Inc., 2008 WL
150487 (M.D. Fla. Jan. 14, 2008)).  Here, despite the idiosyncracies of the pharmaceutical
industry, Ms. Schaefer-LaRose was clearly hired as a Lilly sales representative, not
simply to educate and inform physicians about Lilly pharmaceuticals, but to generate
sales of those products.  That undisputed fact is key to our analysis.

Thus, to the extent that sales are made in the pharmaceutical industry, Ms.
Schaefer-LaRose made sales whenever she received commitments from physicians to
prescribe Lilly drugs.  Without the physicians being persuaded that Lilly products are
superior for their patients, Lilly's pharmaceutical products might not be prescribed and
ultimately sold to patients.  Consequently, when Lilly hires sales representatives who
direct their sales efforts at doctors (as opposed to pharmacists or the patients themselves),
they are attempting to increase sales at the only point where they can hope to do so in the
sales continuum.  When Lilly's sales representatives are deployed, Lilly expects to

receive higher sales in return for its financial investment in its sales force.  And, clearly this approach bears good fruits for Lilly.

Though not addressing the outside sales exemption under the FLSA, the First Circuit, in IMS Health Inc. v. Ayotte, 550 F.3d 42 (1st Cir. 2008), engaged in a similar discussion of the nature and effect of the work performed by pharmaceutical sales representatives, observing that, when they visit physicians, "[t]he objective of these visits is to make sales."  Id. at 71.  That court also recognized that the work performed by pharmaceutical sales representatives results in increased sales revenue for pharmaceutical companies.  Id. at 56 ("Detailing works: that it succeeds in inducing physicians to prescribe larger quantities of brand-name drugs seems clear.").  As stated in that opinion, "the fact that the pharmaceutical industry spends over $4,000,000,000 annually on detailing bears loud witness to its efficiency."  Id.

Unlike non-exempt promotional work, Ms. Schaefer-LaRose's efforts were neither incidental to sales made by others nor performed only for the purpose of increasing Lilly's sales in general.  Indeed, the evidence establishes that a significant portion of her compensation was based on her ability to increase prescription levels *in her sales territory*.  See Novartis, 593 F. Supp. 2d at 652. ("To the extent these physicians write prescriptions for [the defendant's] drugs, it is the Reps – and not other [of the defendant's] employees – who obtain these prescriptions and who receive credit for them by means of incentive payments.").  Ms. Schaefer-LaRose did not merely "grease the skids" in preparing the way for a second wave of Lilly employees who later would visit

those same physicians and close the actual sales.  Ms. Schaefer-LaRose's job was to promote Lilly products to physicians in an effort to receive their commitments to prescribe and, when her efforts succeeded later on in terms of the issuance of a prescription by a physician to a patient who purchases the medication, Ms. Schaefer La-Rose personally received salary benefits for those prescriptions as part of her compensation package.

Clearly, "making sales" was Ms. Schaefer-LaRose's "primary duty" as a Lilly sales representative, which places her squarely within the outside sales exemption. Courts are directed to look to indicia-of-sales factors when determining whether sales work is an employee's "primary duty."  Kuzinski v. Schering Corp., 604 F. Supp. 2d 385, 394-95 (D. Conn. 2009); Ruggeri I, 585 F. Supp. 2d at 267.  Such indicia-of-sales will help determine whether an employee meets the regulation's requirement that she be "employed for the purpose of and . . . customarily engaged" in making sales.  Here, Ms. Schaefer-LaRose's other duties included reviewing monthly reports detailing for each Lilly product the number of prescriptions written by physicians in her sales territory, as well as the products manufactured by major competitors; distributing drug samples to physicians; deciding how to best allocate the funds allowed by Lilly for meals with physicians; and finding speakers for various programs.  All these responsibilities were incidental to and in support of her sales efforts.  Moreover, Ms. Schaefer-LaRose received incentive compensation based upon the number of prescriptions issued by physicians in her sales territory and worked largely independently and without constant supervision.

23

Less significant, but nevertheless notable, is that she received sales training from Lilly and her position was described as "sales representative" or "senior sales representative."

These indicia-of-sales buttress our conclusion that under the FLSA Ms. Schaefer-LaRose's duties comport with the outside sales exemption's purpose.  In reaching this conclusion, we narrowly construe the FLSA's exemptions, while at the same time, "recogniz[e] the realities of the pharmaceutical industry [which] is not incompatible with engaging in a narrow reading [of the statute].  To the contrary, it produces results that reflect the exemption's terms and spirit."  Novartis, 593 F. Supp. 2d at 653.  Nearly seventy years ago, in Jewel Tea Co. v. Williams, 118 F.2d 202 (10th Cir. 1941), the Tenth Circuit provided an illuminating explanation of the rationale for the outside sales exemption:

> The reasons for excluding an outside salesman are fairly apparent.  Such [a] salesman, to a great extent, works individually.  There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.  In lieu of overtime, he ordinarily receives commissions as extra compensation.  He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day.  To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

Id. at 207-08.  The characteristics of Ms. Schaefer-LaRose's position as a Lilly pharmaceutical sales representative align closely with the Tenth Circuit's description of the quintessential outside salesperson.  The highly regulated nature of the pharmaceutical industry stood in the way of her ability to close final sales in the traditional sense, but,

24

when Ms. Schaefer-LaRose chose to put in long hours, her efforts were not directed towards garnering overtime, but rather in generating additional physician commitments to prescribe Lilly pharmaceuticals, and, when she was successful in her efforts, it showed up in increased compensation.  Clearly, Ms. Schaefer-LaRose's work took her away from the office and, with the exception of periodic "ride-alongs" by her supervisors, she worked without direct hour-to-hour, day-by-day supervision.  Given these facts, we conclude that Ms. Schaefer-LaRose's exemption as an outside salesperson is consistent with the underlying purposes of the FLSA.

For the foregoing reasons, we hold that Ms. Schaefer-LaRose qualifies as an exempt employee under the FLSA's outside sales exemption.

### B.   Administrative Exemption

In addition to our conclusion that Ms. Schaefer-LaRose comes within the outside sales exemption of the FLSA, we also hold that she is not entitled to overtime under the FLSA because she is exempt as an "employee employed in a bona fide . . . administrative . . . capacity."  29 U.S.C. § 213(a)(1).

The FLSA regulations define an "employee employed in a bona fide administrative capacity" as any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;

> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the

employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

Ms. Schaefer-LaRose does not dispute that she meets the first requirement under the administrative exemption, to wit, that she is compensated on a salary basis and receives at least $455.00 per week.  Therefore, we address only the second and third requirements of the administrative exemption.

### 1.    Office or Non-Manual Work Directly Related to Management or General Business Operations

The FLSA regulations provide that, in order to satisfy this requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a). Exempt administrative work includes duties such as, "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.  Much of this work, but not all, will relate directly to management policies."  Final Rule Defining and Delimiting the Exemptions for Executive, Administrative, Professional Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,138 (Apr. 23, 2004).  While administrative work includes "those who participate in the formulation of management policies or in the operation of the business

as a whole," the DOL has made clear that the administrative exemption also applies to "persons who either carry out major assignments in conducting the operations of the business or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business."  Id.

The promotional, marketing, and sales work performed by Ms. Schaefer-LaRose is of substantial importance to Lilly's business and is, in our view, the type of responsibilities covered by the administrative exemption.  Initially, under the "production/administration" dichotomy described in 29 C.F.R. § 541.201(a),[11] it is clear that Ms. Schaefer-LaRose has engaged in exempt administrative work as opposed to nonexempt production work.  Lilly's "product" is the pharmaceutical drugs that it researches, manufactures, and develops, and it is undisputed that Ms. Schaefer-LaRose plays no role in producing the pharmaceutical drugs.  Her work, the marketing and promotion of those drugs to physicians, is thus clearly separate from Lilly's production work.  See Novartis, 593 F. Supp. 2d 637, 655 (holding that pharmaceutical sales representatives do not function as production employees because their promotional work is "ancillary to their employer's production work"); Smith v. Johnson and Johnson, 2008 WL 5427802, at *11 (D.N.J. Dec. 30, 2008) ("The business of a pharmaceutical company

---

[11] As noted above, section 541.201(a) provides that, in order to fall within the administrative exemption, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  Id.

is not to educate physicians about their products; it is to produce and distribute those products."); see also Amendola v. Bristol-Myers Squibb Co., 558 F. Supp. 2d 459, 477 (S.D.N.Y. 2008) (holding that pharmaceutical sales representatives are not properly classified as "production" employees).[12]

Ms. Schaefer-LaRose contends that the work she performed for Lilly, that is, promotional and sales efforts focused on a limited, select group of doctors, does not qualify as work "directly related to the management or general business operations" of Lilly, as required by the administrative exemption.  According to Ms. Schaefer-LaRose, her position as a sales representative requires her merely to carry out Lilly's day-to-day operations as opposed to running or servicing the business or determining its overall sales, promotional, and marketing policies, as is required under the administrative exemption.  See Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1125 (9th Cir. 2002) (noting that, to fall within the administrative exemption, an employee must be involved with "'running the business itself or determining its overall course or policies,' not just in the day-to-say carrying out of the business' affairs") (quoting 29 C.F.R. § 541.2); Bratt v. Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990) (declining to apply the administrative exemption to probation officers and treatment counselors because "[t]he services the employees provide the courts do not relate to court policy or overall operational

---

[12] Although the production-administrative dichotomy is not "a dispositive test for exemption," the DOL recognizes that it "is still a relevant and useful tool in appropriate cases to identify employees who should be excluded from the exemption."  69 Fed. Reg. at 22141.

management but to the courts' day-to-day production process.").

We find Ms. Schaefer-LaRose's arguments unavailing.  The success of Lilly's business depends in significant part on whether consumers purchase pharmaceuticals produced by Lilly.  Consumers are able to purchase Lilly's medications only when physicians prescribe those drugs.  According to Ms. Schaefer-LaRose's own description, the sales representatives are "the primary contact between those doctors and Lilly." Schaefer-LaRose Dep. at 248-49.  As "the primary contact," it was her job to represent Lilly in meetings with medical providers and to educate those physicians regarding the company's pharmaceutical products in order to influence their decisions to prescribe Lilly medications, rather than other manufacturers' medications, when and as otherwise medically appropriate.[13]   Therefore, the success of sales representatives, such as Ms. Schaefer-LaRose, in obtaining increased levels of prescriptions is a critical part of Lilly's business because it generates demand for Lilly's product.  As the Smith Court recently observed in holding that the plaintiff, a pharmaceutical sales representative, came within

---

[13] Ms. Schaefer-LaRose also contends that courts differentiate between a corporation's general marketing efforts, such as designing an overall sales campaign, and targeted selling efforts, such as those performed by sales representatives, finding the former to be exempt work and the latter to be non-exempt.  See Casas v. Conseco Finance Corp., 2002 WL 507059, at *9 (D. Minn. March 31, 2002) (holding that plaintiffs did not fall within the administrative exemption because they did not promote "sales 'generally' but are actually selling loans directed to individual customers").  However, we find Ms. Schaefer-LaRose's reliance on Casas to be misplaced because, unlike the plaintiffs in Casas, who made telephone sales calls directly to potential customers and assisted the customers throughout the loan process, Ms. Schaefer-LaRose had no contact whatsoever with individual purchasers of Lilly's pharmaceuticals. Instead, it was Ms. Schaefer-LaRose's job to promote Lilly's medications in general within her geographical sales territory in an effort to have physicians prescribe Lilly's pharmaceuticals with more regularity and frequency, to multiple end-users, thereby increasing Lilly's overall sales.

the administrative exception of the FLSA, a pharmaceutical sales representative's duty to promote and market his or her employers' medications "is an example of the kind of role that, while it does not dictate corporate marketing policy, actually drives the market demand, and therefore substantially affects operation of 'a particular segment of the business.'" Smith, 2008 WL 5427802, at *10 (citing 69 Fed. Reg. at 22,138).

In reaching a similar conclusion with respect to pharmaceutical sales representatives, the Novartis Court held that the "sizeable incentive payments" made to the plaintiff sales representatives for generating prescriptions, as well as the significant level of financial resources committed by the defendant pharmaceutical company to its sales efforts, clearly demonstrated the critical role the company's sales representatives played in its overall success. 593 F. Supp. 2d at 656. Likewise, Lilly's financial commitment to its sales efforts further supports the conclusion that the work performed by Lilly's sales representatives, such as Ms. Schaefer-LaRose, is of the type covered by the administrative exemption. Recall that a significant part of Ms. Schaefer-LaRose's compensation was comprised of bonuses that she received based upon the number of Lilly prescriptions she generated within her sales territory. Furthermore, during the calendar years of 2003, 2004, and 2005, Lilly expended a total of approximately $2.7, $3.2, and $3.5 billion, respectively, on sales costs. See Lilly's "Answers for Shareholders 2005" at 19. Such a substantial financial investment in its sales efforts has but one purpose: to recoup these expenditures through sales of Lilly products; thus, the activities of each individual sales representative have a substantial impact on Lilly's business operations

30

and bottom line.

For the foregoing reasons, we conclude that Ms. Schaefer-LaRose's primary duty was the performance of work directly related to the management or general business operations of the employer or the employer's customers and, as such, satisfies the second prong of the administrative exemption of the FLSA.

### 2.   Discretion and Independent Judgment with Respect to Matters of Significance

Finally, in order to qualify under the administrative exemption, an employee's primary duty – here, marketing to physicians – must also include "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3).  Under the FLSA, "the exercise of discretion and independent judgment" is defined as "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.  The term 'matters of significance' refers to the level of importance or consequence of the work performed."  29 C.F.R. § 541.202(a).  To satisfy this requirement, the employee must have "authority to make an independent choice, free from immediate direction or supervision,"  (id. § 541.202(c)), and must do more than merely "use . . . skill in applying well-established techniques, procedures or specific standards described in manuals or other sources."  Id. § 541.202(e).  However, exercising discretion and independent judgment "does not require that the decisions made by an employee have a finality that

goes with unlimited authority and a complete absence of review. . . . The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment."  Id. § 541.202(c).

Ms. Schaefer-LaRose contends that, as a Lilly sales representative, she rarely exercised discretion or independent judgment.  She maintains that the factual record of this case demonstrates that she "had very little latitude in her job, that she was rigorously trained, closely monitored and supervised, and was subject to strict oversight and control in the performance of her duties."  Pl.'s Resp. at 28-29.  Additionally, she asserts that her "promotional presentations to physicians were strictly controlled by Lilly scripts and verbatims, from which any deviation subjected her to disciplinary action."  Id. at 28.  In contrast, Lilly claims that Ms. Schaefer-LaRose "exercised discretion far exceeding the threshold set by the administrative exemption."  Def.'s Br. at 24.

Our review of the evidence establishes that Ms. Schaefer-LaRose did, in fact, exercise considerable discretion and independent judgment in a variety of areas.  For example, Ms. Schaefer-LaRose testified that when she made sales calls, she would alter her presentation from physician to physician depending on a number of factors, including the number and types of products she was promoting, the time constraints she was working under, the mood of the particular physician with whom she was dealing, and whether she planned to meet with the physician again in the future.  Schaefer-LaRose Dep. at 129-132.  Also, according to Ms. Schaefer-LaRose, it was important to identify

the particular needs of each physician with whom she dealt because, "if you can figure out what people need from you, then you can give them what they need and everybody will be more successful because of it." Id. at 156.

Although it is true, as Ms. Schaefer-LaRose contends, that the promotional tactics and materials she used contained pre-approved and scripted messages, as the Seventh Circuit recently explained in a case closely on point, "[I]ndependent judgment is not foreclosed by the fact that an employee's work is performed in accordance with strict guidelines." Roe-Midgett v. CC Servs., Inc., 512 F.3d 865, 875 (7th Cir. 2008) (holding that claims adjusters exercised independent judgment and the manuals and estimating software that they used to guide their work were "most accurately characterized as tools that channel rather than eliminate [their] discretion") (citations omitted). Here, the record shows that Ms. Schaefer-LaRose exercised discretion when she chose which parts of the pre-approved information to present to which physicians regarding which pharmaceutical products; none of these decisions or strategies was predetermined by Lilly, and all impacted significantly the effectiveness of her presentation.

Ms. Schaefer-LaRose also testified that it was part of her job to analyze reports on a monthly basis containing the number of prescriptions written by physicians in her sales territory for each Lilly product, as well as the products manufactured by major competitors sales reports, in order to keep track of the impact of various promotional techniques, such as speaker programs, on prescription numbers. According to her, she "lived and died by" those reports and, as necessary, would adjust her approach based

33

upon what they revealed.  Id. at 152.  For example, she testified that, "[i]f you were doing well, you would keep doing what you are doing or even up . . . [t]hings like frequency with your manager's permission.  If you were doing poorly, you would try to up your frequency.  You would target specific competitors, depending on their success against your product."  Id.

Nevertheless, Ms. Schaefer-LaRose contends that the fact that she would adjust her approach based upon her analysis of and conclusions from the reports in an effort to improve her performance does not indicate that she had any real discretion because, before making any such changes, she always had to request and be granted permission to make these changes from her supervisor before doing so.  However, the applicable federal regulations quite clearly provide that "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."  29 C.F.R. § 541.202(c).

As previously discussed, even though an employee's decisions may be subject to review or occasionally may be revised or reversed, an employee's responsibilities can entail discretion and independent judgment.  Id. ("[T]he term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.").  True, Ms. Schaefer-LaRose's supervisors would from time to time conduct "ride-alongs" with her (ranging from every two weeks to every quarter) to accompany her on some of her sales calls in order to observe her promotional techniques, but the majority of the time she performed

34

her duties without direct supervision.

To boost the effectiveness of her marketing presentations, Ms. Schaefer-LaRose was provided drug samples for distribution to physicians for their use with patients as well as a budget for promotional purposes to finance such sales initiatives as meals for physicians.  Lilly's sales representatives received guidelines for the allocation of such resources which directed that they be allocated based on physicians' prescribing habits (i.e., more samples and meals should be offered to those physicians who prescribe the most Lilly medications).  However, within those guidelines, Ms. Schaefer-LaRose was entrusted with deciding the number of drug samples to leave with each physician and how best to allocate the meals budget, which Ms. Schafer-LaRose testified she based primarily on the personal relationships that she had developed with the doctors.  Schaefer-LaRose Dep. at 65-66.

These facts clearly demonstrate that Ms. Schaefer-LaRose exercised considerable discretion and independent judgment as part of her daily work for Lilly.[14]  In the areas in

_____

[14] In three recent cases this issue has been addressed based on facts similar to those before us.  All three courts determined that, notwithstanding the restrictions placed upon the plaintiffs (pharmaceutical sales representatives) by their employers, the sales representatives exercised considerable discretion on matters of significance.  See Novartis, 593 F. Supp. 2d at 657-58 (noting that plaintiffs called on physicians and, after assessing how much time was available for the call, chose the best approach to influence the physician; tailored their presentations to best convey various scripted "core messages"; and determined how to use drug samples and other promotional materials); Smith, 2008 WL 5427802, at *11 (citing plaintiff's ability to request permission to visit new physicians or update her marketing plan; lack of supervision from her manager who only accompanied her monthly; and the fact that she sought to have an impact on growing the market share in her territory); and Amendola, 558 F. Supp. 2d at 477 (noting that plaintiffs tailored the content of their presentations to physicians based on

(continued...)

which she exercised discretion, her decision-making related to matters of substantial

significance.  As previously detailed, the success of Lilly's pharmaceutical sales

representatives in generating prescriptions is key to the overall success of Lilly's

business, given that physicians' prescriptions are the only way ultimate consumers can

purchase Lilly medicines.  Because sales representatives are Lilly's primary contact with

physicians, the effectiveness of their marketing and promotional techniques attempting to

influence medical providers' choices of drugs to prescribe determines in part whether

those physicians ultimately prescribe Lilly's medications for their patients.

Thus, we hold that the ways in which Ms. Schaefer-LaRose exercised discretion

and independent judgment (e.g., tailoring her marketing presentation to each medical

provider based on a variety of factors, adjusting her approach in response to reports

revealing the prescription levels in her sales territory in order to increase those numbers,

choosing the method of allocating her drug samples and funds for meals for her

physicians, etc.) were all aimed at increasing her effectiveness in generating increases in

the numbers of prescriptions issued by physicians, a matter of considerable significance

to Lilly to say the least.  Accordingly, the third prong of the administrative exemption of

the FLSA is satisfied.

Thus, we hold that Ms. Schaefer-LaRose fully qualifies as exempt under the

---

[14](...continued)
various factors; decided when and how often to visit individual physicians; determined how to
allocate drug samples and how to spend their promotional budgets).

FLSA's administrative exemption.


### C.     State Law Claims

Under New York law, as under the FLSA, employees are entitled to overtime compensation for hours worked in excess of forty each week.  New York's analogous wage statute also contains outside sales and administrative exemptions defined and applied in the same manner as the FLSA.  See Novartis, 593 F. Supp. 2d at 647-48 (citing 12 N.Y.C.R.R. § 142-2.14(5); Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 575 (S.D.N.Y. 2004)).  Accordingly, for the reason detailed above, we find that Ms. Schaefer-LaRose is an exempt employee and thus not entitled to overtime pay requirements under both the outside sales and the administrative exemptions per New York law, as well as the FLSA.


### III.    Docket No. 559 – Plaintiff's Rule 56(f) Motion

Having found that Ms. Schaefer-LaRose has not demonstrated the existence of any genuine issue of material fact as to whether she was exempt under the FLSA regulations and New York law, we turn to address her objections to the Magistrate Judge's August 8, 2008, denial of her Rule 56(f) motion.  On July 7, 2008, four days before her response brief was due, Ms. Schaefer-LaRose filed a Motion for Relief Under Rule 56(f) [Docket No. 463], seeking a one-month extension of the due date for filing a response to Lilly's motion for summary judgment in order to obtain additional discovery.  Four days later,

before the Magistrate Judge had ruled on her Rule 56(f) motion, Ms. Schaefer-LaRose timely filed her response brief to the Motion for Summary Judgment.  In her response, Ms. Schaefer-LaRose made no reference anywhere in the brief to her Rule 56(f) motion, nor did she cite any deficiency in her brief based on inadequate or incomplete discovery or mention any need for additional discovery or time to respond to the summary judgment motion.  On August 8, 2008, the Magistrate Judge denied as moot Ms. Schaefer-LaRose's Rule 56(f) motion, citing the timely filing of her response brief to the summary judgment motion.  On August 28, 2008, Ms. Schaefer-LaRose filed Objections to the Magistrate Judge's August 8, 2008, Order.[15]

In ruling on non-dispositive matters decided by a magistrate judge, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."  Fed. R. Civ. Pro. 72(a).  Here, however, we would deny Ms. Schaefer-LaRose's Rule 56(f) motion on other grounds than those relied upon by the Magistrate Judge.  Thus, we will assume that Ms. Schaefer-LaRose's request for thirty additional days to respond to Lilly's summary judgment

---

[15] Lilly did not respond to Ms. Schaefer-LaRose's objections, asserting in a footnote in a brief addressing a different motion that Ms. Schaefer-LaRose's objection was untimely. Pursuant to Federal Rule of Civil Procedure 72(a), "[a] party may serve and file objections to the order within 10 days after being served with a copy."  The Magistrate Judge's Order was filed on August 8, 2008, but was not entered on the docket until August 11, 2008.  Therefore, under Federal Rule of Civil Procedure 6, the deadline for filing an objection to the Order was August 28, 2008.  Accordingly, Ms. Schaefer-LaRose's objection was timely filed. See Fed. R. Civ. Pro. 6(a), (d).

motion pursuant to Rule 56(f) was not waived by her filing of a timely response[16] and

proceed to address Ms. Schaefer-LaRose's Rule 56(f) motion on the merits.

When requesting additional discovery pursuant to Rule 56(f), "[p]laintiffs must do

more than request a 'fishing expedition' to hopefully find evidence that will allow them to

make a case."  Daley v. Grajec, 2007 WL 2286132, at *5 (S.D. Ind. Aug. 7, 2007)

(Tinder, J.) (citing Davis v. G.N. Mortg. Corp., 396 F.3d 869, 885 (7th Cir. 2005);

Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002); Korf v. Ball State Univ., 726 F.2d

1222, 1230-31 (7th Cir. 1984)).  In other words, if plaintiff is unable to show how the

discovery sought will help demonstrate the existence of a genuine issue of material fact,

denial of the Rule 56(f) motion is appropriate.  Otto v. Variable Annuity Life Ins. Co.,

814 F.2d 1127, 1138 (7th Cir. 1986).  After a careful and extensive review of Ms.

Schaefer-LaRose's brief and arguments in light of her Rule 56(f) request, we find that she

has not only failed to set forth any specific evidence which she might have obtained from

additional discovery that would create a genuine issue of material fact germane to our

decision but that our ruling on summary judgment could be and has been made on the

---

[16] It is not completely clear from the caselaw whether the filing of a response that does not reference a prior Rule 56(f) motion, or otherwise state areas in which more discovery would be needed to properly respond, renders the previously-filed Rule 56(f) motion moot.  Compare Stewart v. Wilkinson, 2008 WL 2674843, at *4 (S.D. Ohio July 7, 2008) (noting that, after plaintiff filed response to summary judgment motion, earlier motion filed pursuant to Rule 56(f) "appears to be moot"), with Hammer v. Ashcroft, 512 F.3d 961, 971 (7th Cir. 2008), reh'g en banc granted, opinion vacated, 570 F.3d 798 (7th Cir. 2009) (stating in an opinion that was later vacated that "the fact that [the plaintiff] filed his response before waiting to see if the court would grant the continuance shows only that he made the best of what he had, not that he had a fair opportunity to avail himself of discovery.").

basis of the existing record without need of embellishment.  We address each of Ms.

Schaefer-LaRose's additional discovery requests in turn below.


### A.       Requests Nos. 3, 17, and 47 of Plaintiff's 30(b)(6) Notice

These requests address discovery related to the mechanics of medical sales, to wit,

how drugs move through the distribution chain from manufacturer to patient, and how

and when Lilly recognizes revenue from the sales of its products.  Ms. Schaefer-LaRose

contends that this information is necessary to refute Lilly's defense that its sales

representatives "make sales," as that term is defined under the FLSA's outside sales

exemption.  Such information is not germane to our decision, however.  Lilly does not

argue, nor do we find, that Ms. Schaefer-LaRose completed sales transactions in the

traditional sense by completing a transaction involving the transfer of title or property for

consideration.  Nor does Lilly dispute that sales also take place at other points in the

distribution chain.  Instead, we have based our determination that Ms. Schaefer-LaRose

was an exempt outside salesperson primarily on her testimony that it was her "standard

practice" to attempt "to get a commitment" from the physicians she called upon and on

the fact that she then received incentive compensation based upon the prescription rates in

her sales territory.  Thus, information relating to the point at which Lilly recognizes

revenue from its pharmaceutical sales or other information about the distribution chain is

not relevant to our analysis, and thus, would not help Ms. Schaefer-LaRose's efforts to

demonstrate a genuine issue of material fact.

40

**B.**     **Request No. 15 of Plaintiff's 30(b)(6) Notice**

Ms. Schaefer-LaRose asserts that she requires testimony about the ethical and legal guidelines surrounding whether physicians can "pre-commit to prescribing Lilly's products" to respond to Lilly's contention that its sales representatives obtain "commitments" from doctors to prescribe Lilly's medications.  Docket No. 464 at 7. However, Lilly concedes, and we accept as true, that pharmaceutical sales representatives, such as Ms. Schaefer-LaRose, are prevented from soliciting legally binding commitments from physicians.  Because our findings and conclusions on summary judgment are premised on the fact that the commitments Ms. Schaefer-LaRose testified that she obtained from doctors to prescribe Lilly products when medically appropriate were *not* legally binding, the information she seeks in Request No. 15 in order to establish a fact that we have already accepted as true would not enable her to defeat summary judgment.[17]

**C.**     **Request No. 14 of Plaintiff's 30(b)(6) Notice**

Request No. 14 seeks testimony from "[t]he person most knowledgeable about the differentiation of the market performance for any and/or all Lilly products between the promotion efforts of the Pharmaceutical Reps, mass marketing or Direct to Consumer

---

[17] We address only the information requests at issue in Ms. Schaefer-LaRose's Rule 56(f) motion that relate to the exemptions ruled upon in this opinion.

advertising, and/or any other marketing efforts."  Docket NO. 464 at 8.  Ms. Schaefer-LaRose contends that such information, which she maintains could demonstrate that other forms of marketing utilized by Lilly are more successful than the work performed by its pharmaceutical sales representatives, is essential to determining "the level of importance or consequence" of her work for purposes of the administrative exemption.

Even assuming that the information Ms. Schaefer-LaRose seeks would demonstrate that other marketing efforts were as, or even more, effective than the work performed by its pharmaceutical sales representatives, such information would not affect our determination that Ms. Schaefer-LaRose's work is nevertheless of great importance and consequence to Lilly's business.  Merely because Lilly may employ other, also effective means of marketing and promoting its drugs does not diminish the significance of the work performed by its sales representatives.  The fact that Lilly employs a sales force of over 4,000 individuals to makes sales calls on physicians, whose prescriptions are the sole means by which patients can purchase Lilly's products, demonstrates that the work of its sales representatives is important, regardless of other methods it may employ.  Accordingly, the information Ms. Schaefer-LaRose seeks pursuant to Request No. 14 would not create a genuine issue of material fact.

### D.     Request No. 42 of Plaintiff's 30(b)(6) Notice

This request seeks information from Lilly's Regulatory Affairs department about "any policies, procedures, practices or programs . . . insofar as they concern the job

duties, tasks, and responsibilities of Pharmaceutical Reps."  Docket No. 464 at 8-9.
According to Ms. Schaefer-LaRose, because the promotion of pharmaceutical products is
heavily regulated by government entities, such as the Food and Drug Administration
("FDA"), and Lilly's Regulatory Affairs department reviews the promotional materials
used by Lilly's sales representatives and interacts with the FDA to ensure that those
materials do not violate FDA regulations, the testimony she seeks is essential to
determining whether pharmaceutical sales representatives "exercise discretion and
independent judgment," as required by the administrative exemption.  However, the
information Ms. Schaefer-LaRose seeks would not affect our finding that Ms. Schaefer-
LaRose exercised sufficient discretion in her position to satisfy the requirements of the
administrative exemption, no matter what the FDA regulations might be.

Lilly has never argued (nor is our opinion based on a determination) that Ms.
Schaefer-LaRose exercised discretion and independent judgment in part because she
participated in creating Lilly's promotional materials or determined whether those
materials comply with regulatory guidelines.  Lilly does not allege that Ms. Schaefer-
LaRose had any such authority nor in our ruling do we assume that she did.  Rather, we
base our finding that Ms. Schaefer-LaRose exercised discretion when promoting Lilly's
pharmaceuticals to physicians, *despite being restricted to using Lilly's pre-approved
promotional materials and messages*, due in large part to her own testimony that she
would alter her presentation from physician to physician based upon a variety of factors,
including the number and types of products she was promoting and the time constraints

43

she was facing.

Thus, our determination is not premised on a finding that Ms. Schaefer-LaRose was allowed to deviate from Lilly's pre-approved messages, but instead that she exercised discretion and used independent judgment when she tailored her message to each physician she visited by choosing which parts of the pre-approved materials, about which products, to present during each sales call.  Accordingly, given the facts upon which our determination rests, we are unable to find that the testimony Ms. Schaefer-LaRose seeks from Lilly's Regulatory Affairs department would help her in any way to demonstrate a genuine issue of material fact as to whether she herself, as part of her duties, exercised discretion and independent judgment.

### E.      Request No. 46 of Plaintiff's 30(b)(6) Notice

Similar to the information sought from Lilly's Regulatory Affairs department, Ms. Schaefer-LaRose also seeks testimony regarding "the policies, practices, or procedures of any brand team or brand department at Lilly insofar as they concern sales calls or presentations made by Pharmaceutical Reps."  Docket No. 464 at 9.  However, there is no allegation here that Ms. Schaefer-LaRose had a part in designing or creating the branding materials that she used to promote Lilly's pharmaceutical products or that she could deviate from the branding messages that she was provided.  Nevertheless, as discussed above, we found that Ms. Schaefer-LaRose exercised some discretion in crafting different presentations to appeal to different doctors within the boundaries established by Lilly's

pre-approved materials.  Thus, the information Ms. Schaefer-LaRose seeks regarding

Lillly branding teams would not have any effect on our determination that she exercised

discretion and independent judgment in her position as a sales representative.


**F.      Request Nos. 4 and 48 of Plaintiff's 30(b)(6) Notice**

Ms. Schaefer-LaRose requests testimony pertaining to the nature of Lilly's

business and the extent to which the marketing, promotion, and sale of its pharmaceutical

products constitutes part of its business.  She asserts that this information is essential to

determining whether she engaged in exempt administrative work, as opposed to non-

exempt production work, for purposes of the administrative exemption.  However, in our

view, there is no dispute that the products Lilly develops are its drugs and that

pharmaceutical sales representatives, such as Ms. Schaefer-LaRose, do not manufacture

those medications.  The information Ms. Schaefer-LaRose has requested, including

corporate spending levels on sales and marketing and whether Lilly's advertising and

marketing plan includes print and television advertising, cannot alter the nature of Lilly's

underlying, core business or turn Ms. Schaefer-LaRose into a production employee.

Moreover, as noted in the discussion above, while relevant, the "production-

administration" dichotomy is not a dispositive test for exemption.  See 69 Fed. Reg. at

22141.  For these reasons, we find that the information sought here by Ms. Schaefer-

LaRose would not help her claim to survive summary judgment.

Because we hold that Ms. Schaefer-LaRose has failed to demonstrate that the

discovery she seeks would create a genuine issue of material fact, we overrule on other grounds Plaintiff's Objection to the Magistrate Judge's August 8, 2008, Order denying Plaintiff's Rule 56(f) motion.  Accordingly, Ms. Schaefer-LaRose's Rule 56(f) motion is <u>DENIED</u>.

## IV.     Other Pending Motions

### A.     Docket No. 569 – Plaintiff's Objections to Magistrate Judge's September 11, 2008, Denial of Motion to File Surreply

On September 18, 2008, in a marginal entry, the Magistrate Judge denied Ms. Schaefer-LaRose's Motion for Leave to File Surreply to Defendant's Reply in Support of Motion for Summary Judgment [Docket No. 557], "for the reasons set forth in Defendant's opposition brief."  Docket No. 564.  Upon review of the parties' briefings on this motion, we do not find that the Magistrate Judge's denial of Ms. Schaefer-LaRose's motion for leave to file a surreply was in any sense clearly erroneous or contrary to law. <u>See</u> Fed. R. Civ. Pro. 72(a) ("The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.").

The Magistrate Judge was well within his discretion to deny Ms. Schaefer-LaRose's request to file a surreply.  There was no new evidence attached to Lilly's reply and the only "new" arguments raised in the reply were in response to the arguments raised in Ms. Schaefer-LaRose's response brief.  Accordingly, we overrule Ms. Schaefer-

LaRose's Objection to the Magistrate Judge's September 11, 2008, Order.

**B.      Docket No. 565 – Plaintiff's Objection to the Magistrate Judge's September 11, 2008, Order Denying in Part Motion to Compel Rule 30(b)(6) Testimony**

On September 11, 2008, the Magistrate Judge held, with respect to Plaintiff's Request Number 42 in their Rule 30(b)(6) Notice, that the testimony sought from Lilly's Regulatory Affairs department would not be relevant to the dispositive issues and thus denied in part her Motion to Compel.  For the reasons described in our discussion of this request in reference to Ms. Schaefer-LaRose's Rule 56(f) motion, we agree that such information would be irrelevant to Plaintiff's case and to our ruling.  The Magistrate Judge's denial of the motion to compel was neither clearly erroneous nor contrary to law.  Thus, we overrule Plaintiffs' objections to the Magistrate Judge's September 11, 2008, Order.

**C.      Docket No. 602 – Defendant's Objections to the Magistrate Judge's December 23, 2008, Order on Plaintiff's Motion for Protective Order**

On December 23, 2008, the Magistrate Judge granted Plaintiffs' request for a protective order, holding that, in connection with discovery requests that Lilly had served on approximately 400 of the opt-in Plaintiffs in this case, representative, rather than individualized, discovery would be appropriate.  On January 12, 2009, Lilly filed an objection to the Magistrate Judge's Order, pursuant to Rule 72(a) and 28 U.S.C. §

47

636(b)(1)(A), contending that the Magistrate Judge failed "to 'balance the interest of the parties' by weighing 'the importance of [specific] disclosure[s]' to Lilly against any 'particular and specific demonstration' of burden or other good cause shown by Plaintiffs."  Docket No. 602 at 1 (quoting Borom v. Town of Merrillville, 2008 WL 2003075, at *4 (N.D. Ind. May 8, 2008)).

Contrary to Lilly's assertion, however, the Magistrate Judge discussed both the concerns raised by Plaintiffs regarding the breadth of Lilly's requested discovery, which would have consisted of approximately 14,400 responses from 400 opt-in Plaintiffs,[18] as well as Lilly's need in a complex case such as this for broader discovery than might normally be granted.  Finding that Lilly's requested discovery would be unduly costly and burdensome, the Magistrate Judge determined that representative discovery was appropriate, but provided that additional discussions between the parties were necessary in order to determine the proper scope of that discovery in light of the Court's conclusion that Plaintiffs' request for a protective order was justified.  Docket No. 598 at 2-3.

Federal Rule of Civil Procedure 26(b)(2)(c) gives the court broad discretion to limit the frequency or extent of use of the discovery methods otherwise permitted by the Federal Rules of Civil Procedure.  While the Magistrate Judge determined that

---

[18] Lilly served fifteen interrogatories and twenty-one request for production upon each of the 400 opt-in Plaintiffs.  Docket No. 598 at 1.  Lilly requests information such as any job search each opt-in has conducted since 2003 and descriptions of every full-time employment position held by each opt-in since college.  Lilly also requested each of the opt-in Plaintiffs to produce every document in their possession that relates to their employment with Lilly.  Docket No. 572-2 at 6-7.

representative discovery would be appropriate, he recognized that, given the complexity of the issues presented, further discussion between the parties was necessary to determine the exact scope of discovery that would permit Lilly to conduct sufficient discovery to challenge the Court's conditional finding that Plaintiffs are similarly situated, but not be unduly burdensome to Plaintiffs. Since that time, the parties have continued their communications with the Magistrate Judge to more clearly define the appropriate discovery boundaries to ensure fairness to both parties.

In conclusion, although the Magistrate Judge's findings may not have been as specific as Lilly would have liked in determining that representative discovery was appropriate under the facts and circumstances presented here, we are unable to find that the Magistrate Judge's decision was either clearly erroneous or contrary to law. See Adkins v. Mid-American Growers, Inc., 143 F.R.D. 171, 174 (N.D. Ill. 1992) ("[D]espite the differences between Rule 23 class actions and representative suits under the FLSA, individualized discovery is not appropriate under every circumstance."). Accordingly, we overrule Lilly's objection to the Magistrate Judge's December 23, 2008, Order granting Plaintiffs' request for a protective order.

## V.      Conclusion

For the reasons detailed above, we find that Ms. Schaefer-LaRose's employment with Lilly as a sales representative comes within the outside sales and administrative exemptions under both the FLSA and New York law. Therefore, we GRANT Lilly's

Motion for Summary Judgment on Ms. Schaefer-LaRose's overtime claim in its entirety.

Because Ms. Schaefer-LaRose was set forth as a representative plaintiff in this conditionally certified collective action and summary judgment has been entered against her on all claims, Plaintiffs are hereby ORDERED TO SHOW CAUSE within thirty (30) days why this collective action should not be decertified, based on the rulings of the Court.[19]

IT IS SO ORDERED.

Date: _____09/29/2009_____        _____

                                               SARAH EVANS BARKER, JUDGE
                                               United States District Court
                                               Southern District of Indiana

---

[19] Currently on the docket are the parties' cross-motions for summary judgment as to a number of allegedly time-barred opt-in plaintiffs, as well as several motions related to the issues set forth in the parties' cross-motions. Judgment on those motions is reserved pending further proceedings in this matter consistent with this opinion.

Copies to:
Jonathan S. Abady
EMERY, CELLI, BRINCKERHOFF & ABADY LLP
jabady@ecbalaw.com

Ellen E. Boshkoff
BAKER & DANIELS
ellen.boshkoff@bakerd.com

Michael R. DiChiara
JOSEPH & HERZFELD LLP
md@jhllp.com

Gabriel Adam Hawkins
COHEN & MALAD LLP
ghawkins@cohenandmalad.com

Ryan Michael Hurley
BAKER & DANIELS LLP
ryan.hurley@bakerd.com

James A. Jones
GILLESPIE, ROZEN, WATSKY & JONES, P.C.
jaj@grwlawfirm.com

Charles  Joseph
JOSEPH & HERZFELD LLP
charles@jhllp.com

Gregory N. Karasik
SPIRO MOSS BARNESS LLP
greg@spiromoss.com

Eric B. Kingsley
KINGSLEY & KINGLSEY APC
eric@kingsleykingsley.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

James A. O'Brien III
SEEGER WEISS LLP
jobrien@seegerweiss.com

Michael D. Palmer
JOSEPH & HERZFELD LLP
michael@jhllp.com

D. Lucetta Pope
BAKER & DANIELS-SOUTH BEND
lucetta.pope@bakerd.com

Elizabeth  Saylor
EMERY CELLI BRINCKERHOFF & ABADY LLP
esaylor@ecbalaw.com

Christopher A. Seeger
SEEGER WEISS LLP
One William Street
New York, NY 10004-2502

Ira Spiro
SPIRO MOSS BARNESS LLP
ira@spiromoss.com

Christopher Van De Kieft
SEEGER WEISS LLP
cvandekieft@seegerweiss.com

David S. Wagner
BAKER & DANIELS, LLP
david.wagner@bakerd.com

Stephen A. Weiss
SEEGER WEISS LLP
sweiss@seegerweiss.com